GIBSON, DUNN & CRUTCHER LLP
THEANE D. EVANGELIS, SBN 243570
tevangelis@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
hrichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
dmanthripragada@gibsondunn.com
BRANDON J. STOKER, SBN 277325
bstoker@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendants
SCALE AI, INC., SMART ECOSYSTEM, INC.
and OUTLIER AI, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANGELA SCHUSTER, ANNA PENDLETON, HOWARD QUATTLEBAUM, XAVIER RETANA, LATOYA HOWARD, and STEVE MCKINNEY, individually, and on behalf of all other similarly situated,

Plaintiffs,

v.

SCALE AI, INC., a corporation; SMART ECOSYSTEM, INC., a corporation; OUTLIER AI, INC, a corporation; and DOES 1–50, inclusive,

Defendants.

CASE NO. 3:25-cv-00620-JSC

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY CIVIL COURT PROCEEDINGS**

[*Filed Concurrently with Declaration of Christopher Stephens, Declaration of Brandon J. Stoker, and [Proposed] Order*]

Date: July 10, 2025
Time: 10:00 a.m.
Dept: Courtroom 8
Judge: Hon. Jacqueline Scott Corley

Action Filed: January 17, 2025
Trial Date: None Set

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 10, 2025, at 10:00 a.m., or as soon as the matter may be heard before the Honorable Jacqueline Scott Corley of the United States District Court, 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Scale AI, Inc. ("Scale"), Smart Ecosystem, Inc. ("Smart Ecosystem"), and Outlier AI, Inc. (collectively, "Defendants") will and hereby do move, pursuant to the Federal Arbitration Act, for an order: (1) staying the case pending resolution of Defendants' Motion to Compel Arbitration pursuant to the Federal Arbitration Act; (2) dismissing Plaintiffs' class claims; (3) compelling Plaintiffs to arbitrate their claims on individual bases; and (4) staying the action in its entirety pending arbitration of Plaintiffs' claims.

Plaintiffs' claims are subject to a valid and enforceable agreement. Plaintiffs are independent contractors who signed up to use the Outlier and/or Remotasks platforms operated by Scale's subsidiary, Smart Ecosystem. These platforms connect subject-matter experts with opportunities to complete project-based work that helps create and curate data needed to produce AI models. When Plaintiffs created their Outlier and/or Remotasks accounts, they agreed to each platforms' Terms of Use ("Terms"), which both contained, in Section 13, a binding and enforceable mutual Arbitration Provision, including a class action waiver. In the Arbitration Provision, Plaintiffs agreed to resolve "any dispute relating in any way to these Terms, the Outlier [or Remotasks] Systems, or Outlier [or Remotasks] Materials" on "an individual basis" in "binding arbitration, rather than in court." Accordingly, under the FAA, "the court shall make an order directing the parties to proceed to arbitration." 9 U.S.C. §§ 2, 4. The FAA also mandates a stay of all proceedings pending the completion of arbitration. 9 U.S.C. § 3.

This Motion is based on this Notice, the attached Memorandum of Points and Authorities, the concurrently filed Declarations of Christopher Stephens and Brandon J. Stoker and exhibits thereto, all records and pleadings on file with the Court in this matter, all other matters of which the Court may take judicial notice, and all further evidence and argument that may be presented in Reply to any Opposition to this Motion, and any argument or evidence presented at the hearing on this matter.

DATED: April 2, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Theane D. Evangelis*
Theane D. Evangelis
Dhananjay S. Manthripragada
Heather L. Richardson
Brandon J. Stoker

Attorneys for Defendants
SCALE AI, INC., SMART ECOSYSTEM, INC. and OUTLIER AI, INC.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1
II. FACTUAL BACKGROUND ........ 1
A. An Overview of Scale ........ 1
B. Plaintiffs Each Agreed to the Terms of Use of Outlier and/or Remotasks ........ 2
1. Plaintiff Angela Schuster Agreed to Remotasks' Terms ........ 2
2. Plaintiffs Pendleton, McKinney, Schuster, and Retana Agreed to Outlier's Terms ........ 3
3. Plaintiffs Pendleton and McKinney Re-Affirmed Their Agreement to Outlier's Terms ........ 5
4. Plaintiffs Latoya Howard and Howard Quattlebaum Agreed to Outlier's Terms ........ 6
C. The Terms Require Plaintiffs to Arbitrate Their Claims On an Individual Basis........ 9
D. Plaintiffs Refuse to Submit Their Claims to Arbitration. ........ 10
III. ARGUMENT ........ 10
A. The Arbitration Provision Delegates Arbitrability Questions to the Arbitrator........ 11
B. The FAA Requires Bilateral Arbitration of Plaintiffs' Claims. ........ 12
C. Even If the Court Reaches Arbitrability Questions, The Arbitration Provision Is Valid and Enforceable. ........ 13
1. The Parties Formed a Valid Contract. ........ 13
2. The Arbitration Provision is Not Unconscionable. ........ 15
3. The Arbitration Provision Covers Plaintiff's Claims. ........ 17
D. All Proceedings Should Be Stayed Pending Arbitration. ........ 18
IV. CONCLUSION ........ 18



Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

## Cases

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
513 U.S. 265 (1995) ........ 11

*American Express Co. v. Italian Colors Restaurant*,
570 U.S. 228 (2013) ........ 10, 12

*Armendariz v. Foundation Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (2000) ........ 15, 16

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ........ 12, 16

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ........ 17

*Baltazar v. Forever 21, Inc.*
(2016) 62 Cal. 4th 1237 ........ 16

*Bernsley v. Barclays Bank Delaware*,
657 F. Supp. 3d 1327 (C.D. Cal. 2023) ........ 16

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........ 12

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) ........ 11, 12

*Chee v. Tesla Inc.*,
732 F. Supp. 3d 1056 (N.D. Cal. 2024) ........ 16, 17

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ........ 10

*Doctor's Assocs., Inc. v. Casarotto*,
517 U.S. 681 (1996) ........ 14

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........ 1, 13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ........ 1, 11, 13

*In re Holl*,
925 F.3d 1076 (9th Cir. 2019) ........ 13

*Howsam v. Dean Witter Reynolds, Inc.*
(2002) 537 U.S. 79 ........ 11

*Kaplan v. Athletic Media Company*,
705 F. Supp. 3d 992 (N.D. Cal. 2023) ........ 15, 16

*Kilgore v. KeyBank, Nat. Ass'n*,
718 F.3d 1052 (9th Cir. 2013)....................16, 18

*KPMG LLP v. Cocchi*,
565 U.S. 18 (2011)....................10

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019)....................1, 12, 13

*Loewen v. Lyft, Inc.*,
129 F. Supp. 3d 945 (N.D. Cal. 2015)....................17

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....................13, 15

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016)....................12, 15, 16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)....................11, 13

*Newton v. American Debt Services, Inc.*,
854 F. Supp. 2d 712 (N.D. Cal. 2012)....................14

*PacifiCare Health Sys., Inc. v. Book*,
538 U.S. 401 (2003)....................13

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010)....................11

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010)....................12

**Statutes**

9 U.S.C. § 2....................10

9 U.S.C. § 3....................18

## I. INTRODUCTION

Plaintiffs Angela Schuster, Anna Pendleton, Howard Quattlebaum, Xavier Retana, Latoya Howard, and Steve McKinney are independent contractors who signed up to use the Outlier and/or Remotasks platforms operated by Scale and its subsidiary, Smart Ecosystem. These platforms connect subject-matter experts with project-based work opportunities to create and curate data needed to produce AI models. When Plaintiffs created their Outlier and/or Remotasks accounts, they agreed to the Terms of Use for each platform, which both include an agreement to resolve any disputes with Defendants in arbitration and on an individual basis only. In breach of this agreement, Plaintiffs have now filed a Class Action Complaint against Defendants on behalf of themselves and other similarly situated contributors.

Plaintiffs' attempts to evade their commitments to arbitrate disputes with Defendants should be rejected. Because the arbitration agreement delegates questions of arbitrability to the arbitrator, Declaration of Christopher Stephens ("Stephens Decl."), Ex. A at 14 (§ 13(a)(ii)) & Ex. B at 12–13 (§ 13(a)(ii)), the Court's jurisdiction is limited to confirming that the parties have an arbitration agreement and then to compelling individualized arbitration, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65–68 (2019). The arbitration agreements at issue apply broadly to Outlier or Remotasks and their affiliates, and cover "any dispute relating in any way to [the] Terms, the Outlier [or Remotasks] Systems, or Outlier [or Remotasks] Materials," and thus covers every claim asserted in this litigation. As the United States Supreme Court has reiterated repeatedly, the Federal Arbitration Act requires courts to enforce arbitration agreements according to their terms, *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183–89 (2019); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502–05 (2018), and preempts and overrides any barriers to enforcement.

Accordingly, the Court should compel Plaintiffs to arbitrate their claims on individual bases as the arbitration agreement's plain language requires.

## II. FACTUAL BACKGROUND

### A. An Overview of Scale

Scale is a humanity-first artificial intelligence ("AI") company that lays the groundwork for AI innovation. Stephens Decl. ¶ 6. Scale offers a variety of products that help build, deploy, and evaluate

AI, including products that focus on combining AI tools with human experience to improve the quality of data used to train AI models. *Id.* Scale operates contributor platforms that connect subject-matter experts ("Contributors" or "Experts") with opportunities to complete project-based work that helps create and curate data needed to produce high-quality AI models. *Id.*

Since May 2023, Scale has used Outlier as the platform through which Contributors can access and contribute to projects or tasks of their choosing. *Id.* ¶ 7. Outlier is run and operated by Scale's affiliate, Smart Ecosystem. *Id.* Using Outlier, Contributors have the flexibility to set their own hours and sign up for projects that cater to their personal interests, expertise, and availability. *Id.* Scale empowers independent Contributors to pursue flexible opportunities to generate income by connecting them with customers in need of their services. *Id.*

In July 2023, Scale also used Remotasks as a platform through which Contributors could access and contribute to projects or tasks of their choosing. *Id.* ¶ 8. Like Outlier, Remotasks was run and operated by Scale's affiliate, Smart Ecosystem. *Id.* In May 2024, Contributors who used Remotasks were migrated to Outlier. Once a Contributor is migrated to Outlier, he or she is only permitted to use Outlier. *Id.*

## B. Plaintiffs Each Agreed to the Terms of Use of Outlier and/or Remotasks

To access projects and begin contributing, Contributors must first create an account on Outlier or, before its migration to Outlier, Remotasks. *Id.* ¶ 9. At all relevant times, Outlier and Remotasks have required every Contributor to accept and agree to the Terms of Use (the "Terms") during the account-creation process. *Id.* Contributors cannot access, view, or complete any projects without first creating an account and agreeing to the Terms. *Id.* The Terms for Outlier and Remotasks are substantively identical. *Id.* ¶¶ 10, 36 & Exs. A, B.

### 1. Plaintiff Angela Schuster Agreed to Remotasks' Terms

On or about July 16, 2023, Plaintiff Angela Schuster created an account on Remotasks. *Id.* ¶ 12. In July 2023, when a Contributor would begin the account creation process, the first screen the Contributor saw included a checkbox next to the statement: "I agree to the **Terms of Service** and **EU DPA**." *Id.* at ¶ 13. This sentence was presented in black typeface except for the phrases "Terms of Service" and "EU DPA," which were in bold, blue typeface denoting hyperlinks. *Id.* When clicked,

each hyperlink would open a new window with the full text of the Terms of Use and the European Data Processing Addendum agreement, respectively. *Id.* The version of the Remotasks Terms that was hyperlinked was the version last updated on February 14, 2023. *Id.* ¶ 14 & Ex. A.

A Contributor could not proceed with the account creation process until she checked the box next to the statement, "I agree to the Terms of Service and EU DPA." *Id.* ¶ 16. Below is an excerpt of the screen depicting what Plaintiff Schuster would have seen when she created her Remotasks account on or about July 16, 2023:




*Id.* ¶ 16 & Ex. C.

**2. Plaintiffs Pendleton, McKinney, Schuster, and Retana Agreed to Outlier's Terms**

Plaintiff Angela Schuster migrated from Remotasks to Outlier and created an account on the Outlier website on or about May 18, 2024. *Id.* ¶ 12. On or about July 14, 2024, Plaintiff Angela Schuster created another account on the Outlier website and accepted the Terms using a different email address. *Id.* Plaintiff Steve McKinney created an account on Outlier's website and accepted the Terms on or about February 28, 2024; Plaintiff Anna Pendleton created an account on Outlier's website and

accepted the Terms on or about March 8, 2024; and Plaintiff Xavier Retana created an account on Outlier's website and accepted the Terms on or about June 8, 2024. *Id.* ¶¶ 12, 18–22.

Before September 11, 2024, when a Contributor would begin the process of creating an account on Outlier, the first screen a Contributor saw asked Contributors to "Accept the terms and conditions to create an account." *Id.* ¶ 18. Below this text, the webpage contained a checkbox and the following statement: "I agree to the **Terms of Service** and **acknowledge the Privacy Policy**." *Id.* This sentence was presented in gray typeface except for the phrases "Terms of Service" and "acknowledge the Privacy Policy," which were in bold, blue typeface denoting hyperlinks. *Id.* When clicked, each hyperlink would open a new window with the full text of the Terms of Use and the Privacy Policy, respectively. *Id.* The "Terms of Service" hyperlink would open a new browser window on the Contributor's screen that displayed the version of the Terms last updated on February 7, 2023. *Id.* ¶ 19 & Ex. B.

A Contributor could not proceed with the account creation process until he checked the box next to the statement, "I agree to the **Terms of Service** and **acknowledge the Privacy Policy**." *Id.* ¶ 21. Below is an excerpt of the screen depicting what Plaintiffs Pendleton, McKinney, Schuster[1], and Retana would have seen when they created their accounts before September 11, 2024:




[1] As discussed above, Plaintiff Angela Schuster created two separate accounts on Outlier using two different email addresses. Both accounts were created in July 2024. As such, Plaintiff Schuster went through the account creation process described here on two separate occasions and accepted Outlier's Terms twice.

*Id.* ¶ 21 & Ex. D.

### 3. Plaintiffs Pendleton and McKinney Re-Affirmed Their Agreement to Outlier's Terms

On or about April 8, 2024, Scale and Outlier implemented an update that required all existing Contributors, upon their next login, to re-review and re-confirm acceptance of the Terms. *Id.* ¶ 23. Because Plaintiffs Anna Pendleton and Steve McKinney had created their accounts before April 8, 2024, they were affected by this update. *Id.*

Existing Contributors who created accounts before April 8, 2024 could not access the Outlier platform until they completed the re-affirmation process. *Id.* ¶ 24. Starting on April 8, 2024, when Contributors logged in to their existing accounts, Contributors saw a screen that stated: "In order to continue onto the Outlier platform, please read and agree to the Terms and Conditions and Privacy Policy." *Id.* Below this text was a checkbox next to the statement: "I agree to the **Terms of Service** and **acknowledge the Privacy Policy**." *Id.* This sentence was presented in gray typeface except for the phrases "Terms of Service" and "acknowledge the Privacy Policy," which were in bold, blue typeface denoting hyperlinks. *Id.* When clicked, each hyperlink would open a new window with the full text of the Terms of Use and the Privacy Policy, respectively. *Id.* The "Terms of Service" hyperlink would open a new browser window on the Contributor's screen that displayed the version of the Terms last updated on February 7, 2023. *Id.* ¶ 25 & Ex. B.

The Contributor's re-acceptance of the Terms was then logged in Scale's database. *Id.* ¶ 26. Below is an example of what Plaintiffs Anna Pendleton and Steve McKinney would have seen when they reconveyed assent to Outlier's Terms in April 2024:




*Id.* ¶ 27 & Ex. E.

On or about April 15, 2024 and April 8, 2024, respectively, Plaintiffs Anna Pendleton and Steve McKinney each accepted the Terms a second time by checking the box next to the statement: "I agree to the **Terms of Service** and **acknowledge the Privacy Policy**." *Id.* ¶ 29.

**4. Plaintiffs Latoya Howard and Howard Quattlebaum Agreed to Outlier's Terms**

On or about September 11, 2024, Scale and Outlier updated the process for new Contributors to create accounts on Outlier. *Id.* ¶ 30. Starting on or about September 11, 2024, the first screen a Contributor saw asked Contributors to "Review Our Terms of Use and Privacy Policy." *Id.* Below this text, the full text of the Terms was displayed in a textbox for the Contributor to scroll through and review. *Id.* The version of the Terms displayed was the version last updated on February 7, 2023. *Id.* & Ex. B.

Below the textbox, the webpage displayed a checkbox next to the statement: "I agree to the **Terms of Use** and **acknowledge the Privacy Policy**." *Id.* ¶ 31. This sentence was presented in gray typeface except for the phrases "Terms of Use" and "acknowledge the Privacy Policy," which were in

bold, blue typeface denoting hyperlinks. *Id.* When clicked, each hyperlink would open a new window with the full text of the Terms and the Privacy Policy, respectively. *Id.* The "Terms of Service hyperlink" would open a new browser window on the Contributor's screen that displayed the version of the Terms last updated on February 7, 2023. *Id.* & Ex. B.

Below is an excerpt of what a Contributor would have seen when they created an account on or after September 11, 2024. The red circle is added for emphasis to show the hyperlinks to the Terms and the Privacy Policy:



AI Content Reviewer

Welcome! Take the first step towards your new opportunity. Create an account to begin your application.

Review our Terms of Use and Privacy Policy

Last updated: Feb 7, 2023

Welcome to Outlier! These Terms of Use (the "Terms") are a binding agreement between you and Smart Ecosystem, Inc., a Delaware corporation ("Outlier"), regarding your access to and use of www.tryoutlier.com and any other associated mobile or web services or applications made generally available by Outlier (collectively, the "Outlier Site"). Outlier and its affiliates provide the Outlier Site to you subject to these Terms. These Terms consist of the terms and conditions below, and incorporate and include:

- the Outlier Community Guidelines ("Community Guidelines");

- the Outlier Privacy Policy ("Privacy Policy");

I agree to the Terms of Use and acknowledge the Privacy Policy

I understand that I will be entrusted confidential information. I agree that I will not use the information except to perform tasks on Outlier and will not disclose the information to anyone.

I confirm that I am 18 years of age or older.

Submit and sign up with email

Submit and sign up with Google

I have an existing account

*Id.* & Ex. F.

The webpage did not allow Contributors to check the box to agree to the Terms without first scrolling through the textbox with the full text of the Terms. *Id.* ¶ 33. If the Contributor attempted to check the box without first accessing the Terms, the box would remain unchecked and a prompt would pop up stating: "Please read through the Terms of Use and check the box to agree before continuing."

*Id.* Thus, as before, a Contributor could not proceed past this screen to complete the account-creation process without accessing the Terms checking the box signifying agreement to those Terms. *Id.* Below is an example of what a Contributor would have seen if they attempted to check the box agreeing to the Terms without first accessing the Terms. *Id.* The red circle is added for emphasis to show the pop-up notification that would occur if the Contributor attempted to check the box agreeing to the Terms without first scrolling through the textbox displaying the Terms:




*Id.* & Ex. G.

Plaintiffs Latoya Howard and Howard Quattlebaum followed this process and accepted the Terms on October 13, 2024 and November 27, 2024, respectively, by checking the box next to the statement: "I agree to the **Terms of Use** and **acknowledge the Privacy Policy**." *Id.* ¶ 35.

Gibson, Dunn & Crutcher LLP

### C. The Terms Require Plaintiffs to Arbitrate Their Claims On an Individual Basis.

The Terms that Plaintiffs agreed to include a binding arbitration agreement and class action waiver. *See Id.* ¶¶ 40–41 & Ex. A at 13–16 [§ 13], Ex. B at 12–15 [§ 13]. The first paragraph of the Terms[2] states that "Outlier and its affiliates provide the Outlier Site to you subject to these Terms," and the second paragraph encourages the user to read the Terms "carefully," "including the arbitration agreement in Section 13":

> By registering for or accessing the Outlier Site, you accept these Terms and warrant and represent that you are at least 18 years old or the age of legal majority in your jurisdiction and you have authority to bind yourself to these Terms. <u>Please read these Terms, including the arbitration agreement in Section 13, carefully</u>.

*Id.* ¶ 40 & Ex. B at 1 (emphasis added). Section 13, entitled "Applicable Law; Disputes," begins with "ARBITRATION–PLEASE READ." *Id.* ¶ 41 & Ex. B at 12 (hereafter, the "Arbitration Provision"). The first paragraph states, in relevant part:

> If your country of residence or establishment is the United States, the parties mutually agree that <u>any dispute relating in any way to these Terms, the Outlier Systems, or Outlier Materials will be resolved by binding arbitration, rather than in court</u>, except that you may assert claims in small claims court if your claims qualify. Except as specifically set forth in this Section 13, <u>if there is a dispute about whether this arbitration agreement can be enforced or applies, the parties agree that the arbitrator will decide that issue</u>.

*Id.* ¶ 41 & Ex. B at 13 [§ 13(a)(i)] (emphases added).

The Arbitration Provision expressly provides that "[t]he Federal Arbitration Act and federal arbitration law will govern this arbitration provision," and that the "arbitration will be conducted by the American Arbitration Association ('AAA') under its rules." *Id.*, Ex. B at 12–13 [§ 13(a)(i)–(ii)]. The Arbitration Provision also contains an express jury trial waiver, providing that "[t]he parties waive the right to a trial by jury as to all arbitrable disputes." *Id.*, Ex. B at 13 [§ 13(a)(iv)].

Section 13(b) of the Arbitration Provision, entitled "Class and Collective Action Waivers," states that the parties agree "to bring any claims individually and not on a class or collective action basis." *Id.*, Ex. B at 14 [§ 13(b)]. Section 13(b) further provides that "[t]here will be no right or

---

[2] Because the Terms for both Outlier and Remotasks are substantively identical, Defendants hereafter cite Outlier's Terms since all Plaintiffs most recently agreed to those Terms. All arguments apply equally to both the Remotasks' and Outlier's Terms.

authority for any dispute to be brought, heard, or arbitrated as a class action and the arbitrator will have no authority to hear or preside over any such claim." *Id.* The Arbitration Provision lays out in detail additional arbitration procedures that must be followed. *See id.*, Ex. B at 15 [§ 13(c)–(f)].

**D. Plaintiffs Refuse to Submit Their Claims to Arbitration.**

Despite agreeing to the Terms and the Arbitration Provision therein, Plaintiffs filed this lawsuit on January 17, 2025, alleging individual and class claims for injuries resulting from Defendants' alleged violations of California Unfair Competition Law and California common law. *See* Compl. ¶¶ 1, 7–8, 102–111, 123–124, 133–138. Plaintiffs allege that they (1) worked as "Taskers" through "Defendants' automated platform, known as Outlier," *id.* ¶¶ 3, 100 (similar); (2) were exposed to "highly toxic and extremely disturbing Prompts and images through the Outlier platform," *id.* ¶¶ 7, 93, 103; and (3) allegedly suffered a variety of injuries based on work performed through "Defendants' platform Outlier," including allegedly having "developed severe emotional distress," *see, e.g.*, *id.* ¶¶ 7–8, 48, 68, 75, 81.

## III. ARGUMENT

This Court should hold Plaintiffs to their contractual obligations to arbitrate and order them to submit each of the claims asserted in the Complaint to bilateral arbitration under the FAA.

The FAA governs this dispute because the Arbitration Provision appears in the Outlier Terms, which is a "contract evidencing a transaction involving commerce," 9 U.S.C. § 2, and the Arbitration Provision expressly provides that "[t]he Federal Arbitration Act and federal arbitration law will govern this arbitration provision," Stephens Decl., Ex. B at 12–13 [§ 13(a)(i)]. The FAA "reflects an 'emphatic federal policy in favor of arbitral dispute resolution'" and governs any arbitration agreement "involving commerce" in any way. *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (citation omitted); *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). When parties expressly agree that the FAA shall govern an agreement, that language is given effect. *See American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) ("[C]ourts must 'rigorously enforce' arbitration agreements according to their terms.").

Under the FAA, a court is typically limited to considering only two "gateway" issues before compelling arbitration—whether there is a valid arbitration agreement and whether it covers the

Gibson, Dunn & Crutcher LLP

dispute. Here, however, the Arbitration Provision contains a delegation clause that clearly and unmistakably provides that those gateway issues should be resolved by the arbitrator. Under binding Supreme Court precedent, this delegation clause must be enforced absent a showing that the delegation clause is *itself* unenforceable. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010).

**A. The Arbitration Provision Delegates Arbitrability Questions to the Arbitrator.**

"The FAA reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center*, 561 U.S. at 67. Seeking to "overcome judicial hostility to arbitration agreements," *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 272 (1995), the statute embodies a "liberal federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Because the statute is designed to "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible," courts must resolve "any doubts concerning the scope of arbitrable issues … in favor of arbitration." *Id.* at 22, 24–25.

Enforcing the "terms" of the Arbitration Provision, as required by the FAA, means respecting the parties' agreement to have the "arbitrator, rather than a court . . . resolve threshold arbitrability questions." *Henry Schein, Inc.*, 586 U.S. at 65. If the parties "clearly and unmistakably" agreed to delegate questions of arbitrability to the arbitrator, then the arbitrator—not the Court—must decide the "gateway" issues. *Howsam v. Dean Witter Reynolds, Inc.* 537 U.S. 79, 83 (2002); *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022); *Henry Schein, Inc.*, 586 U.S. at 69. Accordingly, when presented with an agreement between the parties delegating arbitrability to the arbitrator, the Court may not inquire into whether the arbitration agreement is valid or enforceable or whether it covers the dispute at issue; rather, it must compel arbitration and allow the arbitrator to decide those questions. *Henry Schein*, 586 U.S. at 65, 68 (the court must compel arbitration "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless").

Here, the Arbitration Provision clearly and unmistakably provides that—except with respect to enforceability of the Class and Collective Action Waivers or PAGA Individual Action Requirement—"if there is a dispute about whether this arbitration agreement can be enforced or applies, the parties agree that the arbitrator will decide that issue." Stephens Decl., Ex. B at 12 [§ 13(a)(i)]. Moreover,

the Terms specify that any arbitration shall be conducted "by the American Arbitration Association ('AAA') under its rules." *Id.*, Ex. B at 13 [§ 13(a)(ii)]. And the AAA's rules grant the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* Declaration of Brandon J. Stoker ("Stoker Decl."), ¶ 2, Ex. 1. The express incorporation of the AAA's rules into the Terms further constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability questions. *See Caremark*, 43 F.4th at 1029; *accord Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[I]ncorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."). The Court should thus enforce the parties' unambiguous agreement and require Plaintiffs to arbitrate any threshold issues of arbitrability. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016).

**B. The FAA Requires Bilateral Arbitration of Plaintiffs' Claims.**

Although the Arbitration Provision is binding and enforceable, it expressly excludes from its scope any questions regarding the enforceability of the parties' class action waiver, which are for the Court to decide. Stephens Decl., Ex. B at 14 [§ 13(b)]. To remain faithful to the parties' agreement, the Court should enforce the Arbitration Provision's class waiver and order the parties to individual arbitration.

In *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), the Supreme Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *Id.* at 684; *accord Lamps Plus, Inc.*, 587 U.S. at 182–88 (holding courts may not compel parties to arbitrate in any manner that is "markedly different from . . . 'traditional individualized arbitration'" and that "interferes with [the] fundamental attributes of arbitration"—informality, speed, and cost-efficiency—unless the parties expressly agreed to do so). Far from agreeing to class treatment or class arbitration, the parties here expressly *prohibited* class claims. And in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), the Supreme Court affirmed the enforceability of class waivers in FAA-governed arbitration agreements, reaffirming the bedrock principle that arbitration agreements must be enforced as written. *Id.* at 352. The Supreme Court also explained that class arbitration was inconsistent with the fundamental attributes of

arbitration as contemplated by the FAA. *Id.* at 348; *accord Am. Express*, 570 U.S. at 233. And more recently, in *Lamps Plus*, the Court held that, under the FAA, courts cannot compel arbitration on a classwide basis where the arbitration agreement in question is ambiguous (let alone silent) on the issue. 587 U.S. at 182–83. "Class arbitration is not only markedly different from the 'traditional individualized arbitration' contemplated by the FAA, it also undermines the most important benefits of that familiar form of arbitration." *Id.* at 183 (citing *Epic Sys.*, 584 U.S. at 508–09).

Consistent with this long line of precedent favoring individual arbitration, the Court should require Plaintiffs to arbitrate on an individual basis pursuant to the class action waiver. That provision provides that Plaintiffs may only "bring any claims individually and not on a class or collective action basis," and that they have "no right or authority for any dispute to be brought, heard, or arbitrated as a class [or collective] action and the arbitrator will have no authority to hear or preside over any such claim." Stephens Decl., Ex. B at 14 [§ 13(b)]. The class action waiver is explicit that arbitration must proceed on a non-class basis, and that is how the Court should order the parties to move forward.

### C. Even If the Court Reaches Arbitrability Questions, The Arbitration Provision Is Valid and Enforceable.

Because the Arbitration Provision delegates gateway arbitrability questions to an arbitrator, the Court's inquiry should end there. *See supra* pp. 11–12; *Henry Schein*, 586 U.S. at 65, 68. Even if the Court considers questions concerning the scope or enforceability of the Arbitration Provision, the FAA still requires arbitration. Two "gateway" issues would determine whether to compel arbitration: (1) whether there exists a valid agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 n.2 (2003); *see also Moses H. Cone*, 460 U.S. at 24–25 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). Both gateway issues are satisfied here.

#### 1. The Parties Formed a Valid Contract.

A contract is formed electronically when a user receives reasonable notice of its terms and takes action that objectively manifests assent. *See In re Holl*, 925 F.3d 1076, 1082–85 (9th Cir. 2019) ("Federal courts [applying California law] . . . have recognized the general enforceability of similar online agreements that require affirmative user assent."); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–

80 (2d Cir. 2017) (collecting cases); *see also Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 681, 687–88 (1996) (finding FAA preempts heightened notice requirements for arbitration clauses, such as a state law requiring that notice of arbitration be "typed in underlined capital letters on the first page of the contract").

Here, Plaintiffs each formed a contract to arbitrate by accepting the Terms when they created their Outlier and/or Remotasks accounts. Stephens Decl., ¶¶ 12, 17, 22, 29, 35; *see also Newton v. American Debt Services, Inc.*, 854 F. Supp. 2d 712, 722 (N.D. Cal. 2012) ("In California, '[a] party cannot avoid the terms of a contract on the grounds that he or she failed to read it before signing.'" (citation omitted)). For each Plaintiff, the terms of the Arbitration Provision were clearly and conspicuously communicated. When each Plaintiff first created their Outlier and/or Remotasks accounts, they were presented with a clear blue, bolded hyperlink to the respective Terms and asked to review and accept. *See supra* at 2–8; Stephens Decl., ¶¶ 13, 18, 24, 31 & Exs. C, D, E, F. In each instance, Plaintiffs were encouraged to read the Terms "carefully," "including the arbitration agreement in Section 13." *See supra* at 9–10; Stephens Decl., ¶ 40 & Exs. A, B. Each time, Section 13 admonished Plaintiffs in capitalized lettering, "ARBITRATION–PLEASE READ." *See supra* at 9–10; Stephens Decl., ¶ 41 & Exs. A, B. Each Plaintiff could not proceed to the Outlier website without clicking a box next to the statement: "I agree to the **Terms of Use**[3] and **acknowledge the Privacy Policy**." *See supra* at 2–8; Stephens Decl., ¶¶ 16, 21, 33 & Exs. C, D, G.

Some Plaintiffs also had unique and individualized experiences in creating their Outlier and/or Remotasks accounts and accepting the Terms that only underscore the adequacy of the notice they received. Plaintiffs Schuster, Pendleton, and McKinney were presented with the Terms and accepted the Terms on multiple occasions. Stephens Decl., ¶¶ 12, 17, 22, 29. Plaintiff Schuster accepted the Remotasks Terms when she created her Remotasks account on July 16, 2023. *See supra* at 2–3; Stephens Decl., ¶¶ 12, 17 & Ex. C. Plaintiff Schuster then accepted the Outlier Terms twice—first when she created her Outlier account on May 18, 2024, and then again when she created a second

[3] When Plaintiff Schuster created her Remotasks account, this statement read: "I agree to the **Terms of Service** and **EU DPA**." See *supra* at 2–3; Stephens Decl., ¶ 13 & Ex. C. When Plaintiffs Schuster, Pendleton, McKinney, and Retana created their Outlier accounts prior to September 11, 2024, this statement read: "I agree to the **Terms of Service** and **acknowledge the Privacy Policy**." See *supra* at 3–8; Stephens Decl., ¶¶ 18, 21 & Ex. D.

Outlier account with a different email address on July 14, 2024. *See supra* at 3–5; Stephens Decl., ¶¶ 12, 22 & Ex. D. Plaintiffs Pendleton and McKinney each accepted the Outlier Terms first when they created their Outlier accounts on March 8, 2024 and February 28, 2024, respectively, and then a second time on April 15, 2024 and April 8, 2024, respectively, when they were asked to re-review and re-accept the Terms after Outlier issued an update to their website. *See supra* at 3–6; Stephens Decl., ¶¶ 12, 22, 29 & Exs. D, E.

When Plaintiffs Howard and Quattlebaum created their Outlier accounts on October 13, 2024 and November 27, 2024, respectively, in addition to the clear blue, bolded hyperlink to the Terms, the account creation page also displayed in a textbox with the full text of the Terms. *See supra* at 6–8; Stephens Decl., ¶¶ 30, 31 & Ex. F. If Plaintiffs Howard and Quattlebaum attempted to check the box without first scrolling through the Terms, the box would remain unchecked and a prompt would pop up stating: "Please read through the Terms of Use and check the box to agree before continuing." *See supra* at 6–8; Stephens Decl., ¶ 33 & Ex. G. Plaintiffs Howard and Quattlebaum were thus required to scroll in the textbox containing the Terms and check the box accepting the Terms before they were allowed to create their Outlier accounts. See *supra* at 6–8; Stephens Decl., ¶¶ 33, 35 & Ex. G.

Finally, for all Plaintiffs, after acceptance, the Terms could be reviewed again at any time on Outlier's and/or Remotasks' websites. See *supra* at 2–8; Stephens Decl., ¶¶ 38, 39 & Exs. A, B.

Under California law, such agreements are binding, as "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Kaplan v. Athletic Media Co.*, 705 F. Supp. 3d 992, 1001–02 (N.D. Cal. 2023); *see Meyer*, 868 F.3d at 75–80 (collecting cases and approving "clickwrap" sign-up process).

**2. The Arbitration Provision is Not Unconscionable.**

To the extent Plaintiffs argue that the Arbitration Provision is unenforceable because it is unconscionable, that claim is unavailing. Plaintiffs will be unable to prove that the Arbitration Provision is unconscionable because the TOU is neither substantively nor procedurally "unconscionable"—both of which must be present to decline to enforce the agreement. *See Mohamed*, 848 F.3d at 1211 (citing *Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114

(2000)). Procedural unconscionability focuses on "oppression or surprise due to unequal bargaining power," while substantive unconscionability depends on whether the contract terms are "overly harsh" or produce "one-sided results." *AT&T Mobility LLC*, 563 U.S. at 340, cleaned up (quoting *Armendariz*, 24 Cal.4th at 114). Unconscionability "requires a substantial degree of unfairness *beyond a simple old-fashioned bad bargain*"; rather, it requires a contract that is "so one-sided as to 'shock the conscience.'" *Mohamed*, 848 F.3d at 1210, cleaned up (quoting *Baltazar v. Forever 21, Inc.* 62 Cal. 4th 1237, 1244–45 (2016) [emphasis in original]). "Both procedural and substantive unconscionability must be present in order for an agreement to be unenforceable." *Id.* at 1211 (citing *Armendariz*, 24 Cal.4th at 114). Plaintiffs, as the parties resisting arbitration, "bear[] the burden of proving" unconscionability. *Kaplan v. Athletic Media Co.*, 705 F. Supp. 3d 992, 1004 (N.D. Cal. 2023). But they cannot meet it.

***First***, the Arbitration Provision is not procedurally unconscionable because there was no "surprise." As explained above, the Arbitration Provision was clearly and conspicuously communicated to Plaintiffs when they accepted Outlier's and/or Remotasks' Terms. The first page of both Terms encouraged them to read the Terms "carefully," "including the arbitration agreement in Section 13," and Section 13 admonished them in capitalized lettering, "ARBITRATION–PLEASE READ." *See supra* at 9–10; Stephens Decl., ¶¶ 40, 41 & Exs. A & B. The Arbitration Provision is presented in plain English and in the same font size as the rest of the Terms. *See id.*, Exs. A & B. This is the opposite of "buried." *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1059 (9th Cir. 2013) (finding no procedural unconscionability where arbitration clause was "in its own section, clearly labeled, in boldface" as opposed to "buried in fine print"); *Chee v. Tesla Inc.*, 732 F. Supp. 3d 1056, 1063–64 (N.D. Cal. 2024) (enforcing arbitration provision despite small degree of procedural unconscionability because arbitration provision had "no headings, boldface, italiciz[ation], or otherwise emphasized text to alert Plaintiff to the presence of the agreement"). Even if the Terms were deemed to be a contract of adhesion, because there was no element of surprise, that would establish only a "*minimal* degree of procedural unconscionability." *Bernsley v. Barclays Bank Delaware*, 657 F. Supp. 3d 1327, 1338 (C.D. Cal. 2023) (emphasis added). Under California's "sliding scale" framework, the Arbitration Provision remains enforceable absent a showing of a "high degree of substantive unconscionability." *Chee*, 732 F. Supp. 3d at 1062, 1065 (requiring "high degree of

substantive unconscionability to render the agreement unenforceable" because there was "small degree of procedural unconscionability"); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 956–58 (N.D. Cal. 2015).

***Second***, the Arbitration Provision is not substantively unconscionable because no provision is so one-sided as to "shock the conscience." Rather, the provisions are reasonable and even-handed—they require *both* parties to arbitrate disputes through a neutral arbitrator, they adopt the ordinary procedures implemented by AAA, they do not restrict discovery beyond the standard AAA rules, they do not reduce the statute of limitations, and they require Outlier to pay all of Plaintiffs' arbitration fees above "the filing or initial appearance fees applicable" in California state court. *See* Stephens Decl., Ex. A at 13–15 [§§ 13(a)(i)–13(a)(v)] and Ex. B at 12–14 [§§ 13(a)(i)–13(a)(v)]. Several provisions even *favor Plaintiffs*, including Plaintiffs' option to pursue small claims in state court, *Id.*, Ex. A at 13–14 [§ 13(a)(i)], Ex. B at 12–13 [§ 13(a)(i)], and to reject "any" subsequent changes to the Arbitration Provision, *id.*, Ex. A at 14–15 [§ 13(a)(v)], Ex. B at 13–14 [§ 13(a)(v)].

**3. The Arbitration Provision Covers Plaintiff's Claims.**

Because a presumption of arbitrability exists where a contract contains an arbitration agreement, a motion to compel arbitration must be granted when it cannot "be said with positive assurance that the arbitration [agreement] is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted). "Doubts should be resolved in favor of coverage." *Id.* (citation omitted).

Under the Arbitration Provision, there can be no mistake: "***any*** dispute ***relating in any way*** to these Terms, the Outlier Systems, or Outlier Materials will be resolved by binding arbitration, rather than in court." Stephens Decl., Ex. B at 12 [§ 13(a)(i)], emphases added. Plaintiffs' claims unquestionably "relate" to the Outlier System and Outlier Materials. Plaintiffs' Complaint is replete with allegations that they: (1) worked through "Defendants' automated platform, known as Outlier," Compl. ¶¶ 3, 100 (similar); (2) were exposed to purportedly "disturbing Prompts and images through the Outlier platform," *id.* ¶¶ 7, 93, 103; and (3) allegedly suffered a variety of injuries based on work performed through "Defendants' platform Outlier," *id.* ¶¶ 7–8, 48, 68, 75, 81. Because each of Plaintiffs' claims is covered by the plain language of the Arbitration Provision, the FAA requires this Court to compel arbitration of Plaintiff's claims on an individual basis.

**D. All Proceedings Should Be Stayed Pending Arbitration.**

Pursuant to United States Code, Title 9, Section 3, this Court should stay all of Plaintiffs' claims pending resolution of this Motion and completion of Plaintiffs' individual arbitrations. The FAA provides that if suit is brought "upon any issue referable to arbitration," the court "shall on application of one of the parties stay the trial . . . until such arbitration" is complete. 9 U.S.C. § 3. Accordingly, Scale respectfully requests that the Court stay all proceedings in this action pending resolution of this Motion. If the Court grants Scale's Motion and compels arbitration, Scale respectfully requests the Court continue its stay of all proceedings until the arbitration is completed. *See Kilgore*, 718 F.3d at 1057 ("9 U.S.C. § 3 . . . require[s] stay of civil action during arbitration.").

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Compel Arbitration and Stay Civil Court Proceedings.

DATED: April 2, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Theane D. Evangelis*
Theane D. Evangelis
Dhananjay S. Manthripragada
Heather L. Richardson
Brandon J. Stoker

Attorneys for Defendants
SCALE AI, INC., SMART ECOSYSTEM, INC. and OUTLIER AI, INC.